## Olive Hill Fire Brick Company v. Ash.

(Decided January 16, 1912.)

### Appeal from Carter Circuit Court.

1. **Master and Servant—Safe Place to Work.—It** is not the duty of a master to furnish a servant an absolutely safe place to work. It must be a reasonably safe place considering the kind and character of the work done.

2. **Same—Defective Petition—Cured by Verdict.—A** petition which charges that the master failed to furnish a safe place, is not good; but the defect in this respect is cured by the verdict, and by an instruction which confines the jury to a consideration of whether the place of work was reasonably safe.

3. **Same—Duty of Servant.—A** servant whose duties do not include those of examination and inspection is under no duty to discover defects in the safety of his place of work. Unless they are patent and obvious to one of his understanding and experience he may recover.

4. **Same—Reliance Upon Statement of Master.—The** servant is entitled to rely upon the statements of the master as to the character and surroundings of the place in which he is put to work; nor need such statement reach the dignity of a guaranty.

THEOBALD & THEOBALD for appellant.

SCOTT & HAMILTON for appellee.

OPINION OF THE COURT BY JUDGE WINN—Affirming.

Appellee, Dock Ash, on April 4th, 1910, was at work as a laborer for the appellant, the Olive Hill Fire Brick Company, engaged, among other things, in mining fire clay at the plant of the latter. His mine boss was one Trav Tackett. An entry had been driven into the mine and from it were "necked" certain rooms in which the miners would work taking down the clay. On the day in question, as Ash testifies, he and some other men were at work with the mine boss outside the mine, starting a new entry, when a shower came up. Tackett said that they were needing clay and that all hands should go into the hill to work until the rain was over. The boss directed

Ash, after they had gone into the room spoken of in the record as Lon Medley's room, to bore a couple of holes. These holes were bored into the fire clay with an auger four feet long; whereupon the holes were filled with powder and a blast made to loosen the clay, which was a rock-like substance. After he had drilled one hole in Medley's room Ash testified that Tackett said to him, in substance, to go into Joe Brickle's room and bore some in there.

These two rooms were, at the place where they left the entry, some eighteen to twenty feet apart. On the occasion in question, as appears from the testimony, Tackett, the boss, said, in substance, in the presence of Ash and other laborers, that he wanted to break through between these two rooms; that it would be the work of a couple or three weeks to go through; that he then asked Ash whether it would take so long; that Ash then responded that he could not tell; that if the two rooms ran in the same direction it was as thick further back in the rooms between them as it was at the entry; that Tackett then responded: "It is. I have just been around there and examined it; just as thick, here it runs in the same direction." It further appears from the evidence that the two rooms, instead of running the same distance apart all the way, converged toward each other until they reached a point where the wall of clay separating them was only some five or six feet in thickness. Upon the Medley side of this wall, he, Medley, bored a hole, put in a blast, and just as Ash had finished the work which he had been doing in Brickle's room, Medley fired his blast. The blast, instead of loosening the clay on Medley's side, blew through the foot or two of clay remaining between its head and the room where Ash was. A small mass of fire clay, driven by the blast, struck Ash in the face. It broke his jaw in two places, rendered him unconscious for a time, made it impossible for him to eat other than liquid food for about a month, and according to the testimony of a physician, introduced by him, as well as that of Ash himself, permanently impaired his hearing, and left his jaws in such shape as that they would not meet so that he could masticate his food. To recoup himself for the injury thus received he brought his action against the company, and upon a trial obtained a verdict and judgment for $1,000. Thereupon arises this appeal.

We have recounted such portion of the testimony

above, as seems necessary to make clear the statement of the case. It is further in evidence that the custom obtained in the mine for a miner, who was preparing to fire a shot, to cry out "fire in the hole," as a warning to all those engaged at work in the room, in order that they might run out in the entry to a place of safety before the shot was fired. While it is proper to say that Ash testifies that he did not hear this warning of the shot which injured him, the testimony is pretty conclusive upon the point that the warning was given, and heard by others located much further from Medley's room than was Ash. One witness, however, who is uncontradicted in the record, testifies as to the custom of the miners, after the warning had been given, that "if they have got a place they ain't afraid of, they stay in it if they want to." This is about all the testimony of any consequence in the record. Tackett was not introduced to deny that he made the statements above ascribed to him by Ash.

The petition charges but two grounds of negligence; one, that the company was negligent in failing to furnish him a safe place to work; the other, that the mine boss was incompetent. The latter charge drifted out of the case and no instruction was asked or given upon it. It is argued for the appellant that the petition was fatally defective, in that it charged a failure to furnish a safe place, not a reasonably safe place, as was the company's obligation to do. A petition which charges a failure to furnish an absolutely safe place is bad; but in the case at bar the instruction incorporated the word "reasonably" in defining the duty of the master as to the safety of the place. The pleadings, of course, did not go to the jury; and the instruction given in the proper form upon this aspect, together with the verdict thereon, cured this defect. See Western Assurance Company v. Ray, 105 Ky., 523, and sundry other cases.

It is also urged that the court erred in refusing to give an instruction upon the fellow servant doctrine; but we have not had our attention called to any evidence of any negligence of any fellow servant, which, in any way, contributed to the injury of Ash.

Complaint is also made of the refusal of the court to give an instruction offered by defendant, in substance, that, if Ash, by the exercise of ordinary care, could have discovered his danger, it was his duty to have discovered it, and that if he failed to do so he could not recover. Let it be remembered that the matter at issue was whether

the defendant furnished plaintiff a reasonably safe place to work. The rule is, that a servant, whose duties do not include those of examination and inspection, is under no duty to discover defects in the safety of his place of work; and unless they are patent and obvious to one of his understanding and experience, he may recover when injured as the result of being in an unsafe place. This principle is thoroughly discussed in Pfisterer v. Peter & Company, 117 Ky., 501. The principle named makes it obvious that there was no error in the refusal to give this instruction.

It is also urged for appellant that the court, in giving the instruction defining the duty of the appellant, erred in not qualifying the intendment of a reasonably safe place, by the words, in substance, "considering the nature and character of the work he was required to do." We think, however, that the language of the court in telling the jury that it was the defendant's duty to furnish the plaintiff with a reasonably safe place "in which to carry on the work in which he was engaged" sufficiently meets the objection named.

Instruction No. 7, given by the court, is complained of; but it suffices to say that the record does not disclose any exception by the appellant to the giving of this instruction.

Objection is also urged to instruction No. 8, in that it assumes that the plaintiff was at work at the point where he was by the express order of the boss. We do not so read the instruction; for by it the jury was left to find from the evidence whether the plaintiff was engaged at work at that place by the order of the boss. It is remarked that there is no evidence to support it; but Ash testifies directly that Tackett told him to go into Brickle's room and bore in there.

The appellant further argues that there is no testimony to show that the mine was not a safe place; that there was no inherent danger in it as it stood, but that the accident resulted from the negligent operation of a safe mine. It is not the safety of the mine that determines the question. It is the safety of the place while the mine is being worked in the manner and form in which work is done in the mine. In other words, the mine, standing unworked, may be a perfectly safe place; and yet an altogether dangerous place when the machinery, appliances and methods necessary and customary in it are being engaged in mining purposes. There

is no testimony showing any improper operation of the mine, or that the injury resulted from any improper operation. The injury resulted from the thinness of the wall interposed between the injured man and the blast upon the other side. A room, one side of which is of fire clay not over six feet in thickness, can hardly be said to be a safe place to work when a blast is fired at the head of a hole drilled four feet into the wall from the opposite side.

The one vital question in the case, as it seems to us, is whether or not (conceding that the warning was given) Ash had the right to stay in the room where he was, instead of running out into the entry, as was the custom. Now in the amended petition it is charged that Tackett stated that the wall was eighteen to twenty feet thick; when in fact he knew, or by the exercise of ordinary care could have known, that it was not more than from four to six feet in thickness. A witness testifies, as above pointed out, that a part of the custom prevailing in the mine was that the laborer might remain where he was after the danger warning was given, if he thought he was in a safe place. The inquiry, therefore, becomes important to be answered as to whether the statement of Tackett as to the thickness of the wall, was one upon which Ash had the right to rely. This question must be answered in the affirmative. A statement of a superior to a subordinate does not need to reach the dignity of a guaranty or an assurance of exact certitude. The servant may rely upon it if it is so phrased or so made as to be calculated to induce or lead one of ordinary prudence and ordinary judgment to accept the statement as a fact; and especially is this so if the statement is about a condition of which it is the duty of the master to have knowledge, and of which the servant has not knowledge, or of which it is not his duty to inform himself. Measured by this test it is not to be held otherwise than that Ash, with the statement of Tackett in his mind, had the right to rely upon it as the true condition existing in the mine, of which Tackett was the boss. If Tackett did not know the untruth of this statement it was his duty to know it. It resulted that Ash believed himself to be in a safe place, when it was not safe.

The instructions as a whole are somewhat prolix, but they fairly state the law of the case. Under section 134, of the Civil Code, we are not permitted to reverse for

any defect which does not affect the substantial rights of the parties.

We find no substantial error in the record, and the judgment is affirmed, with damages.