## Geary v. McCreary.

(Decided February 29, 1912.)

### Appeal from Clay Circuit Court.

1. Master and Servant—Personal Injury—Pleadings.—Where a servant was injured by reason of an unusual and unnecessary jerk given to a cable that run over a mast pole, causing the mast pole to break and hit the servant, and the petition charged that the accident was due to the defective condition of the mast pole and to the fact that an unusual and unnecessary jerk of the machinery caused it to break, the plaintiff may recover upon proof of either act of negligence.

2. Same—Assumed Risk.—The servant does not assume risks that follow from negligent acts on the part of the master. His assumption of risk does not cover conditions that grow out of the failure of the master to exercise ordinary care to protect him from danger. He only assumes risks incident to ordinary conditions that are free from negligence on the part of the master.

3. Same—Act of Servant to Escape Injury When Placed in Peril by Negligence of Master.—If the servant is suddenly and unexpectedly placed in a position of immediate danger, and in an effort to avoid it he exercises ordinary care and prudence and does what an ordinarily prudent man would have done under the circumstances, he will not be guilty of contributory negligence, although he did not adopt the best means for his escape or made an error of judgment as to the best course to pursue in trying to avoid injury:

DISHMAN & DISHMAN, S. B. DISHMAN, A. D. HALL and J. H. HAZELRIGG for appellant.

W. E. FAULKNER, H. C. FAULKNER, W. W. RAWLINGS, H. C. FAULKNER, JR. for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

This action was instituted by the appellee McCreary against the appellant Geary to recover damages for personal injuries received while assisting as an employe in the operation of a drilling machine owned by Geary.

Upon a trial, he was awarded damages in the sum of $10,000.00.

At the time the injuries complained of were received, Geary was endeavoring with his machine to lift out of an oil well that had been bored for oil several hundred feet of casing. The method employed was substantially this—a large pole, called a mast pole, was erected on the ground near the engine. Near the base of this pole was a drum, around which was wound a coil of cable. The cable ran from this drum, up the mast pole to its top, and then through a wheel on the top of the pole, thence down to the well, where it was attached to the casing intended to be pulled out. When the power from the engine was applied to the drum, the cable would be wound around it, thereby lifting the casing at the other end; and when it was desired to relax the strain on the cable, the drum would be so revolved as to loosen the cable. The mast pole, which was about 45 feet long, consisted of two large pieces of white pine of equal length spliced together with iron bolts and bands. This pole when in use was so erected that it stood about four feet out of the perpendicular, and was held in its place by wires running out from a point near the top and fastened to stakes in the ground. It seems that the casing that it was attempted to pull from the well was difficult to move, and after making several efforts by the use of all the power that could be applied, the operators found that they were unable to move the casing. It is claimed by McCreary that Geary ordered the engineer to give it a "jerk," that is, to slacken the cable and then suddenly start the drum; and that when this method was adopted, the mast pole was not strong enough to withstand the sudden and severe strain put on it by the "jerk," and it broke, the top of it falling to the ground. McCreary, who was standing near the engine in the performance of his duties, observed the mast pole break, and in an effort to get out of danger, happened to run in the direction the top of the pole fell, when he was hit by it, receiving injuries that permanently destroyed his capacity to perform work or enjoy life.

One of the grounds urged for reversal is that the cause of action stated in the petition is based on averments that the mast pole was old and defective, and by reason of its defective condition broke when the "jerk" given to the cable by the appliance of power put such a severe strain upon it. And it is said that under the

averments of the petition no recovery could be had unless there was evidence to show both the defective condition of the pole and that a "jerk" was given to the machinery; or, as stated by counsel for appellant "the charge is not that the alleged 'jerk' and unusual force exerted was more than was usual or was necessary in the ordinary operation of the machine in pulling casing, but that because of the defects alleged they say that it was. Our contention is that in the absence of evidence sufficient to show a defective mast pole or other defective parts known to appellant or that could have been known by reasonable care that appellee failed to show sufficient evidence to authorize the case to go to the jury." But we are not able to agree with counsel in his construction of the pleadings. The third amended petition, which was made for the purpose of perfecting the other petitions and stating clearly plaintiff's cause of action, averred:

"That the defendant had negligently allowed the lower half of the boom or mast of the drilling machine mentioned in the petition to become old and decayed and defective and same broke in two just below the splice and middle of the boom and in the old, decayed and defective part of the mast or boom; and in addition thereto, he says that just before the injury to plaintiff, the defendant negligently and carelessly ordered his engineer in charge of the engine and power attached to and which was running the machinery at which plaintiff was working, to slack up the machinery, rope and other attachments by which the power was applied to the casing which was to be drawn out of the well, and then to jerk the same; and this order the said engineer instantly obeyed, and slackened up the machinery and appliances and started the engine and power attached to the drum and other machinery with great and unusual and unnecessary force and violence, so that when the power of the said machinery was so applied to the cable, which reached over the top of the defective boom or mast and down to the casing aforesaid, it crushed and broke the aforesaid old decayed and defective and insufficient mast or boom just below the middle and in the old part aforesaid, so that the upper part of the boom or mast fell upon and injured the plaintiff. * * *"

We think this petition stated two causes of negligence, one being the decayed and defective condition of the mast or boom, and the other the fact that the ma-

chinery was started with unusual and unnecessary force and violence. If there had been no evidence that the mast or boom was decayed or defective, the plaintiff would be entitled to recover upon showing by evidence that it was caused to break because of the unusual and unnecessary force and violence applied by the sudden "jerk" given to the machinery. It seems quite clear that it would require a greater strain to break the pole if it had been sound than it would if it was in a decayed and defective condition, and, so assuming that the pole was sound and in good condition, it would seem that a very unusual strain must have been put upon it to break it. In the instructions given, the court did not put the case for the plaintiff upon the ground that the pole was defective, but upon the ground that if they believed from the evidence—

"That the defendant, or his agent and servant superior in authority to the plaintiff, slacked up the machinery, rope and other attachments mentioned in the evidence, by which the power was applied to the casing which was to be drawn out of the well, and that they or either of them then negligently and carelessly started the engine and power attached to the drum and other machinery with a jerk or with such great and unusual force and violence as that it was calculated to and did place upon the appliances and upon the mast of the drilling machine a strain greater than it was reasonably calculated to bear, and so much so that it broke and fell upon the plaintiff and produced the injuries complained of in the petition. * * *"

As under the evidence and instructions the case for the plaintiff was rested upon the proposition that the injury was caused by the unusual and unnecessary "jerk," it was of course necessary that he should sustain this act of negligence by sufficient evidence to support the verdict. Upon this point, McCreary testified as follows:

"Well he (the engineer) pulled—I guess something like two hours and a half that we had pulled on it (the casing). Q. Did it move? A. Never moved; if it ever moved I never could tell it. Q. In what way were you pulling those pulls there—the length of time that you worked? A. We were pulling steady pulls, pulling steady pulls with the rope fastened to the casing. Q. Now, several efforts had been made to pull it? A. Yes, sir. Q. About how long did one of these efforts last—

trying to lift and stop before it was exhausted? A. He would pull, sometimes just pull for life, giving a strain on it, pull for 3 or 4 minutes, and let back and come again. Q. Those efforts were continuously repeated at the time you have spoken of? A. Yes, sir. Q. With no result, I believe you say? A. Yes, sir. Q. What was Mr. Geary doing at that time? A. He was sitting back there and watching to see if the casing started. Q. What did he do or say? A. Well, he set back there, and after I suppose he was getting out of heart and wasn't expecting for it to be pulled, he told James Jackson (the engineer) to 'jerk' the machine, to 'jerk' the engine, and see if that started it. Well, he let all the slack back, and gave the machine a quick 'jerk' and when he done that, that pole—I seen it start; it looked like from where I was standing here, that it was going to fall direct on me.''

Joe Rawlings, who was present, testified that he understood Geary to tell Jackson to give it a quick ''jerk'' or something that way, and that he noticed a quick ''jerk'' for a few seconds and then the pole broke. On cross-examination he was asked:

''Q. Was you that far from him (Geary) when you heard him say something, heard him say 'give it a quick jerk'? A. Yes, sir, something like that. Q. You now tell this jury you heard Capt. Geary that distance and in that noise. A. That is what I understood him to say. Q. I want you to state to the jury whether or not you can state on your oath you heard Capt. Geary give any such instructions as that? A. As I told you, I thought I heard him tell Mr. Jackson to 'give it a quick jerk.' Q. You now say to the jury that you heard that in all that noise? A. Yes, sir, I understood it that way.''

Reed Hughes, who said he had had considerable experience in pulling casing out of walls, testified that in his opinion it was not proper to attempt to ''jerk'' casing out in the manner in which it was attempted to be ''jerked'' when the accident complained of happened. That such a ''jerk'' would be liable to break something about the machinery. Another witness testified that he heard Geary say something to Jackson, just a moment before the pole broke, but did not know what he said.

Geary testified that he did not direct Jackson to give the machinery any ''jerk,'' and that Jackson did not at any time give more than the usual and ordinary ''jerks'' necessary in pulling casing. That the engine and machinery at the time of the accident were being operated

in the usual way. He further said that he could not explain why the pole broke, as there was no apparent cause for it. Jackson, the engineer, said that the efforts made to pull the casing were those ordinarily used in such business and that no unusual or unnecessary "jerk" was made.

We think the evidence for plaintiff was sufficient to take the case to the jury upon the issue that the pole was caused to break by reason of some extraordinary and unusual as well as unnecessary strain put upon it by reason of the "jerk" given to the cable by the machinery. Under the evidence for both the plaintiff and defendant, the jury might well have concluded that the pole would not have broken if the machinery had been operated in the usual and customary manner.

It is another contention on behalf of appellant that the work in which McCreary was engaged was attended with some danger as are all employments in which machinery is used, and that he assumed the risk incident to the ordinary conditions attending the labor in which he was engaged. But it is elementary in the law of negligence that the servant does not assume risks that follow from negligent acts on the part of the master. His assumption of risk does not cover conditions that grow out of the failure of the master to exercise ordinary care to protect him from danger. In other words, if no unusual or unnecessary "jerk" had been given to the machinery, and the pole had broken by reason of an ordinary and usual strain put upon it, and there was no other negligent act on the part of the master that caused it to break, it might well be said that McCreary assumed the risk of an injury that resulted from an unaccountable accident that no degree of care on the part of the master could guard against. But that is not the case before us.

It is further insisted that when the pole broke, McCreary was standing in a place of safety, and that if he had remained where he was he would not have been injured, and, therefore, there should be no recovery in his behalf. The evidence upon this point is that if McCreary had remained where he was standing when the pole commenced to fall, he would have escaped injury, but he testifies that when he first noticed the pole breaking he did not know which way it would fall and believed that it might fall at the place he was standing or that he might in some way be injured by it, and, that in making an honest effort to escape from the danger he believed he was

in, he was hit by the pole. This theory of the case was properly submitted to the jury in an instruction telling them that—

"If they believed from the evidence that the plaintiff negligently and carelessly ran under and in the way of the falling machinery or appliances, and thereby contributed to his own injury, so as that but for such contributory negligence on the part of the plaintiff the injury would not have happened, then the jury should find for the defendant. But upon this point the court instructs the jury that if they shall believe from the evidence that the plaintiff was suddenly and unexpectedly placed in a position of immediate danger, and that he ran to avoid such danger, and in doing so used ordinary care and prudence for his own safety in trying to avoid such danger, and used such ordinary care and prudence as ordinarily prudent men would have done under like circumstances, and shall further believe from the evidence that said danger, if such there was, was caused by the carelessness and negligence of the defendant, then the plaintiff should not be held guilty of contributory negligence, even though he did not adopt the best means for his escape or made an error in judgment as to the best course to pursue in trying to avoid injury." South Covington R. Co. v. Ware, 84 Ky., 267; L. & N. R. Co. v. Molloy, 122 Ky., 219.

Upon the whole case we see no substantial error to the prejudice of appellant, and the judgment is affirmed.