## A. Bentley & Sons Co., et al. v. Bryant.

(Decided May 31, 1912.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Third Division).

1.  Master and Servant—Action for Personal Injuries—Negligence.—
    Appellee was scalded and badly injured by hot water falling upon him from the exhaust pipe of an engine which appellant, a building contractor, and his employer, allowed to be placed so that its contents were cast into a passway used by its employees in going to and from their work; the negligence of the engineer in discharging water from the pipe, without notice to appellee and others in the passway, concurring with that of appellant in producing the injuries.

2.  Master and Servant.—As appellee at the time of receiving his injuries was returning to his work in obedience to a signal from the engine whistle, he was then engaged in the service for which he was employed by appellant, therefore, the relation of master and servant existed at the time of the accident.

3.  Master and Servant—Assumption of Risk—Concurring Negligence.—As the appellant builder was required to furnish appellee a reasonably safe place to work, and the latter, at the time he was injured, did not know of the projection over the passway of the exhaust pipe or the danger of then passing it, there was no assumption of risk arising from the master's violation of the primary duty of furnishing him a reasonably safe place to work; and the master is liable in such case whether the injury to the servant resulted from the negligence alone, or the concurrence

of his negligence with that of a servant, in a different department, or that of a fellow servant of the injured employee.

4. Master and Servant.—Under the facts appearing in this case the limit of inquiry with respect to the assumption of risk by appellee, was whether, in point of fact, he, at the time of exposing himself to danger, actually knew of the same.

5. Master and Servant—Permanent Injury to Servant—Damages Awarded.—As according to the evidence appellee's suffering from the scalding received was excruciating and his ability to earn money thereby permanently impaired and greatly lessened, it is not apparent that $6,000.00, the amount awarded by the verdict of the jury, was excessive.

SHIELD & CAMPBELL, CAMDEN R. McATEE for appellants.

POPHAM, TRUSTY & ROOSE for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This is an appeal from a judgment for $6,000 damages recovered by appellee in the court below against the appellants, A. Bentley & Sons Co., a corporation, and E. T. Seng; Seng being an employe of A. Bentley & Sons Co., entrusted with the duty of operating their stationary hoisting engine. Appellee was a carpenter in the employ of the appellant, A. Bentley & Sons Co., which, as contractor, was erecting what is known as the Snead building at or near the corner of Market and Ninth streets in the city of Louisville, Ky. The recovery in question was for injuries sustained by the appellee from being scalded, while on the premises, alleged to have been caused by the negligence of appellant, A. Bentley & Sons Co. in failing to provide him with a reasonably safe place to work, and the concurring negligence of its engineer, Seng, in the operation of the stationary engine of which he was in charge. It is averred in the petition that attached to the stationary hoisting engine which the appellant, A. Bentley & Sons Co., employed in hoisting material used in the construction of the building, was an exhaust pipe which it negligently laid and maintained in such a manner as to cause it to rest upon the roof of an adjoining tool house with its end projecting therefrom a foot or more over a passway, which made the passway dangerous to its employes in going to and from their work by reason of the exhaust of steam and hot water thrown off at times from the engine.

It is further averred in the petition that as appellee was going through this passway to his work as a car-

penter in the fifth story of the building, steam and hot water fell from this pipe on him, whereby he was so badly scalded upon his face, chest, shoulder and arm, as to cause him great physical and mental suffering, permanently disable him, and greatly lessen his ability to earn money. It was the custom of the engineer, Seng, not to start the engine or cause the exhaust pipe to emit steam and hot water until after the workmen about the building left the passway, where the water would be thrown, but on the occasion of appellee's receiving his injuries Seng, as claimed by appellee, negligently started the engine and caused the flow of hot water from the exhaust pipe while he and other workmen were in the passway, without notice to them of his purpose to do so, and that such negligence on his part, concurring with that of the appellant, A. Bentley & Sons Co., in maintaining the pipe so that it projected over the passway, caused appellee's injuries.

The answer of the appellants rested their defense upon the following grounds:

First: That appellee, at the time of receiving his injuries was not engaged in the service of the appellant, A. Bentley & Sons Co., therefore it was not under any duty to provide him a safe place to work.

Second: That the injuries he sustained were incidental to his employment and resulted from an assumed risk.

Third: That if appellee was injured by Seng's negligence there should have been no recovery as Seng is a fellow servant.

Fourth: That appellee's injuries were caused by his own negligence.

It appears from the evidence that the building being erected by the appellant, A. Bentley & Sons Co., had in the rear of it a large vacant space belonging to the lot and that upon this vacant space it erected various sheds and shops, which were stored with material and tools for use in the construction of the building. The vacant space also contained a drive or passway which extended from Ninth street to and in the rear of the building and was used by wagons and employes at work upon the building in going to and returning from same. Where the passway reached the building a run-way was provided, one end of which rested upon the ground in the passway, the other end extend-

ing to the third floor of the building; this run-way was used by the employes in getting upon and coming down from the building. The tool shed on the roof of which the exhaust pipe rested was on the south side of the passway, and south of the tool shed was situated the boiler and engine from which the exhaust pipe led; the tool shed being between the boiler and the passway obstructed the view so that the engineer could not, from the engine, see persons passing in front of the exhaust pipe nor could those walking through the passway see the engineer or the boiler of the engine. The tool house was the place where the carpenters, steel and concrete workmen kept their tools, and where the workmen usually left their baskets or buckets containing their dinners.

Before beginning work in the morning the employes gathered in and about this passway to the tool house and waited for the whistle which required them to go to their respective places of work on the building and premises. At the noon hour the employes came from the building by means of the run-way and ate their dinners in the sheds, on the run-way or other convenient places, and usually remained where their meals were taken until it was time for them to return to work, notice of which was given by a blast of the whistle at 12:25 o'clock. Following this signal they were allowed five minutes to get to their places of work; at the end of the five minutes another blast of the whistle was the signal for them to begin work. The passway referred to was the only suitable one provided for the use of the workmen in going to and from the building and all who used it were compelled to pass where the exhaust pipe projected from the roof of the tool house. It was about eight feet from the ground to the mouth of the exhaust pipe and hot water was emitted from the pipe only after the engine had been standing for a considerable time following its operation. In view of this fact there was little occasion for the workmen in or upon this building to observe the exhaust pipe; in other words, the exhaust usually occurred after the men had passed the shed, or after they had reached the building, and, as the pipe was so much above the heads of those using the passway, unless it happened to be throwing out water as they approached, there was little probability of its being seen by them. Moreover,

there was no placard or other sign to indicate the presence of the pipe or the danger arising therefrom.

On the day appellee received his injuries the whistle for noon lunch was blown at 12 o'clock as usual and it was then necessary for the workmen to leave their places on the various floors of the building and obtain and eat their lunches, that they might be ready to return to their work at the end of twenty-five minutes, or at any rate, to be ready to begin work at the end of thirty minutes. When the 12 o'clock whistle sounded appellee left his place of work on the fifth floor of the building and descended to the ground by means of the run-way leading from the third floor to the passway and he and his brother sat upon the run-way and ate their lunch, which had been brought them by appellee's son. After completing their lunch, and just before the 12:25 minute whistle blew, appellee walked through the passway toward Ninth street with his son and stopped at a place between the tool house and Ninth street entrance where a crowd of workmen were standing and talking. While there the 12:25 whistle blew and he then turned and walked through the passway to the building in advance of the other workmen. When he reached the point in the passway where the exhaust pipe extended over it, hot water was thrown therefrom in large quantities. There was no warning of any kind that the exhaust was about to occur nor does it appear from the evidence that appellee knew or had cause to know that it was time for it to occur. Indeed, according to his testimony, which we do not find contradicted, save by one witness, appellee did not then know of the presence of the pipe; there were at the time he was scalded from twelve to twenty men in the passway, and it does not appear from the evidence that any of them knew of the presence of the pipe; on the contrary, many of them, examined as witnesses, testified that they did not know of its presence, and the reason thereof is apparent because it was shown by the evidence that the pipe had been upon the roof of the tool house only three weeks; prior to which time its contents had been emptied into a hole near the engine.

John Masters, a witness introduced by the appellant, testified that the appellee stopped in the passway for a brief conversation with him and said the pipe "puked hot water," and that appellee then walked directly in front of the pipe and stood there looking up at it until

the scalding water fell upon him. Masters further testified, that he was sitting in the window of the tool shed immediately under the end of the pipe at the time this conversation occurred. Masters was uncorroborated as to this conversation by any other witness. Appellee denied that any such conversation took place as related by Masters, but said that in passing Masters the latter said to him, ''How are you?'' and his reply was, ''Alright.'' Three or four other workmen testified that they were passing Masters as appellee was and that no such conversation as that related by Masters took place; and the testimony of numerous witnesses was to the effect that if Masters was, as claimed, sitting in the window of the tool house at the time of the alleged conversation with appellee he could not have been under the end of the pipe, as stated by him, for the pipe projects at the corner of the tool house shed and the window is by actual measurement seventy inches from the corner.

We think the weight of the evidence sustains appellee's contention that he did not know of the presence of the exhaust pipe until he received his injuries; therefore, the record furnishes no support for that of appellants that he was injured as the result of his own negligence. This being true, the defense based on the plea of contributory negligence we will not further consider. It is also apparent that appellant's contention that appellee was not engaged in the services of A. Bentley & Sons Company when injured, is without support from the evidence. If there could be any doubt as to the existence of the relation of master and servant between the parties during the twenty-five minutes succeeding the sounding of the 12 o'clock noon whistle as the signal for luncheon, it was certainly removed by the blast of the whistle given at 12:25 o'clock, which summoned the appellee and the other workmen to their work and allowed them five minutes in which to resume it. It is true that during the twenty-five minutes appellee's time was at his own disposal; he might have spent it in eating his luncheon or otherwise, either at or away from the building; but when commanded by the master to return to the work for which he was employed, whatever may have been his temporary status during the twenty-five minutes of rest from labor, appellee again became the servant; and was as much a servant in returning to the place of work as he would have been upon resuming work at the place of its performance.

It was conclusively shown by the evidence and admitted by the appellants that appellee had, in common with the other workmen, been notified by the whistle to return to his work, and while on his way to resume it and with yet three minutes of time in which to reach the place of work, he received the injuries complained of. Obviously, these facts established the relation of master and servant at the time he was injured. Mitchell Transfer Co. v. Ehmett, 65 S. W., 835; Wilson v. C. & O. Ry. Co., 130 Ky., 349; C., N. O. & T. P. R. R. Co. v. Mayfield's Admr., 145 Ky., 305; C., N. O. & T. P. R. R. Co. v. Richardson, 145 Ky., 516; Thomas v. Wis. Cent. Ry. Co., 23 L. R. A. (N. S.), 954.

The doctrine of assumption of risk, relied on by the appellants, has no application to a case like this. In the absence of actual knowledge on the part of the servant there is no assumption of a risk by him arising from the master's violation of a primary duty; and the master is liable whether such negligence alone results in injury to the servant, or concurs with the negligence of a servant in a different department, or with the negligence of a fellow servant.

In the instant case the danger created by the presence in the passway of the exhaust pipe, was one for which appellee was not required to search. He was charged with no duty of inspection; therefore he assumed no risk with respect to the danger arising from the presence in the passway of the exhaust pipe, or the negligence of the engineer, Seng; the limit of inquiry with respect to the assumption of risk by appellee is whether, in point of fact, he, before exposing himself to the danger, actually knew of the same. The doctrine here announced has been repeatedly declared by us, and an examination of the following cases, and others not cited, will show the consistency with which it has been adhered to. Phisterer v. Peter & Co., 117 Ky., 501; Broadway Coal Mining Co. v. Southard, 144 Ky., 453; Geary v. McCreary, 147 Ky., 254; Straight Creek Coal Co. v. Huddleston's Admr., 147 Ky., 94; Olive Hill Fire Brick Co. v. Ash, 146 Ky., 253; C., N. O. & T. P. R. R .Co. v. Martin, 146 Ky., 260; L. & N. R. R. Co. v. Brown, 127 Ky., 732; Swan, Day & Co. v. Thompson, 122 S. W., 907; N. E. Coal Co. v. Preston, 132 Ky., 262; Black Diamond Co. v. Parker, 115 S. W., 215; Milton's Admr. v. F. & V. T. Co., 139 Ky., 53; Lou., Etc., Co. v. Cavens' Admr., 9 Bush, 559.

Not only did appellee himself testify that he did not know of the presence of the exhaust pipe in the passway or the danger arising therefrom, but practically the whole of the evidence, except that of the discredited witness, Masters, was to the same effect. Indeed, the evidence leaves no doubt as to the dangerous character of the exhaust pipe to persons using the passway in which appellee was injured; therefore, it is patent that the appellant, A. Bentley & Sons Company, in maintaining it failed to provide a reasonably safe place for its employes to perform the work required of them.

In our opinion appellee and the engineer, Seng, were not fellow servants, but had such been the case, it would not have been material, as it is apparent from the evidence that Seng was guilty of negligence in causing the exhaust pipe to discharge hot water before appellee and his fellow employes left the passway in returning to their work; and, as Seng's negligence concurring with that of the master, A. Bentley & Sons Co., in failing to make the passway reasonably safe for its employes, must be held to have caused the appellee's injuries, both are liable therefor.

It follows from what we have said that there was no error in the refusal of the trial court to grant the peremptory instruction asked by appellants, at the conclusion of the evidence. In our opinion the instructions given by the court fully explained to the jury the entire law of the case as applicable to the issues of fact presented by the pleadings and evidence. As it would unduly extend the opinion to copy the instructions therein and they are not seriously criticised in the brief of appellant's counsel, further comment upon them is deemed unnecessary.

We do not regard appellant's complaint that the verdict is excessive, well founded. A careful reading of the evidence with respect to appellee's injuries convinces us that they were not only unusually painful, but that they also permanently impaired his ability to earn money. According to the evidence a large quantity of scalding water fell upon him from the exhaust pipe, which burned him on his face, left shoulder, right side and around his body to the kidney line; that his left eye was injured and his vision to some extent, at least, impaired by the scalding of his face; that his right arm was left in such a condition, and its muscles so contracted,

as to make it impossible for him to use that arm or hand as he formerly did. Indeed, according to the weight of the evidence, he will never again have good use of the right hand or arm, which will greatly interfere with, if it does not wholly prevent, his returning to his occupation as a carpenter.

In addition, it appears that keloids have formed on the right arm, side and groin, which have not only contracted the muscles to such an extent as to interfere with the use of the arm and stooping or bending of the body, but that from friction of the clothing they produce an intolerable itching, which causes sleeplessness and consequent impairment of the nervous system. His injuries also kept appellee in bed for many weeks, under almost constant care of physicians and prevented him from performing any sort of labor from July of one year to October of the next, during which time he incurred an indebtedness to his physicians, for attention given him, of $400.

According to the evidence, appellee was earning $18 per week, at the time he was injured and his loss of wages during the period mentioned, amounted to at least $1,100. By deducting this sum and the physician's bills from the $6,000 awarded by the verdict of the jury, it will be seen that the $4,500 remaining cannot be said to be unreasonable compensation for appellee's sufferings and the permanent impairment of his ability to earn money resulting from the injuries sustained; particularly is this true, when we take into consideration the further fact that he is yet a young man with an expectancy of twenty-three years to his credit.

Judgment affirmed.