## Chesapeake & Ohio Railway Company v. Shaw.

(Decided February 17, 1916.)

### Appeal from Mason Circuit Court.

1. Removal of Causes—Jurisdiction of State Courts to Retain Case—Review on Appeal to Supreme Court of United States.—Where, in an action for personal injuries brought under the federal employers' liability act, the defendant, a foreign corporation, filed its petition for a removal to the federal court, upon the ground that the allegations in the petition as to the interstate nature of the plaintiff's employment were untrue, and were fraudulently made for the purpose of preventing the defendant from removing the case to the federal court, the State court had jurisdiction to retain the case and try it, subject to a review on appeal to the Supreme Court of the United States.

2. Master and Servant—Personal Injuries—Interstate Commerce.—Where a baggagemaster on a train running from Cincinnati, Ohio, to Maysville, Ky., was injured while assisting in side-tracking his train at Maysville in order to let a fast train pass, he was engaged in interstate commerce, although his crew had orders to take on an additional coach at Maysville and continue as an excursion train from Maysville to Russell, Ky., and return.

3. Master and Servant—Negligence—Submission to Jury.—Where the switch-rod betweein the ties of a railroad track required a space only five inches deep for its operation, and there was evidence to the effect that the space occupied by the switch-rod was ten inches deep, and that the plaintiff was injured while walking over the track by getting his foot caught between the tie and the switch-rod, there was sufficient evidence of negligence upon the part of the company to take the case to the jury.

4. Appeal and Error—When Verdict Will Not be Disturbed.—The Court of Appeals will set aside the verdict of a jury only when it is flagrantly against the evidence; where the testimony is contradictory merely, the verdict will not be disturbed.

5. Master and Servant—Assumption of Risk.—In accepting employment the servant assumes the risk of such accidents and resulting injury as might happen to him in the ordinary and customary

course of his employment; he does not assume any risk from accident or injury arising from the failure of the master to exercise ordinary care to furnish him a reasonably safe place in which to work.

6. Trial—Damages—Impairment of Earning Power—Instructions.— In a suit for damages for loss of time and the impairment of the plaintiff's power to earn money, the jury should be instructed that the recovery for the impairment of plaintiff's power to earn money should begin when the time lost had ended; but, if the instruction failed to limit the plaintiff's recovery to the impairment of the plaintiff's power to earn money in the future, and the defendant should desire a more specific instruction to that effect, he should ask the court to make it so, and upon his failure to call the court's attention to the immaterial error he will not be permitted to complain upon appeal.

7. Damages—Action Under Employers' Liability Act—Nine of Jury May Find Verdict.—In an action to recover damages for personal injuries under the federal employers' liability act, it is competent for nine of the jury to find a verdict.

8. Appeal and Error—Failure to Index Record—Fees.—Where the clerk who made the record failed to provide it with an index, as required by Rule 5 of the Court of Appeals, it will be condemned, and the clerk will be prohibited from collecting anything therefor.

WORTHINGTON, COCHRAN & BROWNING for appellant.

A. D. COLE for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Affirming.

This is an appeal from a judgment awarding the appellee, John B. Shaw, $10,000.00 damages for injuries sustained as the result of having been run over by one of appellant's trains in its yards at Maysville.

At the time of the accident Shaw was in the service of the appellant as baggage-master on one of its passenger trains running between Cincinnati, Ohio, and Maysville, Kentucky, and known as the "Maysville Accommodation." This train left Cincinnati about six o'clock on Saturday evening, June 4th, 1913, and, according to its schedule time, it should have arrived at Maysville about eight o'clock. It was, however, about five minutes late on this occasion. According to its custom, after stopping at the principal depot at Maysville and discharging such of its passengers as desired to alight there, the train would proceed about half a mile east to what is known as the Market Street Depot, where the remaining passen-

gers would be discharged; and the train would then be backed to the yards immediately west of the principal depot, where the engine would be placed on a turn-table and turned around preparatory to the trip back to Cincinnati on the next morning—the entire train remaining in the yard during the night.

In making this backward movement from the Market Street station it was customary for Shaw to act as rear brakeman, while the train was backed from Market street to the yards, and while it was doing the necessary switching in the yards. On the day of the accident, before the train left Cincinnati, orders were given its crew that after reaching Maysville the train was to take on another coach and then proceed eastwardly as an "extra," No. 73, to Russell, Kentucky, and return to Maysville the next morning, which was Sunday. The object of this extra trip was to bring down from Portsmouth to Maysville the Portsmouth base ball team and an excursion crowd, to be picked up at South Portsmouth, Kentucky, a station a few miles west of Russell, and between Russell and Maysville.

On the night of the accident, when the "Maysville Accommodation" reached the Maysville depot, a part of the passengers and all of the baggage were unloaded, and the train then proceeded east to Market street, where the remaining passengers were unloaded. When this had been done, it was about eight o'clock in the evening, and about five minutes later than the schedule time.

The appellant's fast eastbound passenger train, No. 6, was due at Maysville about eight o'clock, and in order to permit this fast train to pass, the "Maysville Accommodation" train was backed down to the yards, the appellee, Shaw, taking his position on the rear of the train, as usual.

The Maysville yard contains a "lead" track, which connects with the eastbound main track at a point west of the depot, and runs in a south-westwardly direction to a turn-table, a distance of about 500 feet, and four switch tracks which branch off westwardly from the "lead" track and run parallel with each other. Beginning with the one nearest the eastbound main track, these switch tracks are known as switch tracks No. 1, No. 2, No. 3, and No. 4, respectively. There is a switch stand located between the two main tracks, about opposite the point where the "lead" track begins. This switch stand is used to

operate the switch connecting the "lead" track with the eastbound main track. There are also switches connecting the four switch tracks with the "lead" track, each of these switches being operated by switch stands located at the point of intersection between the switch track and the "lead" track, and known as switch stands Nos. 1, 2, 3, and 4, respectively. These switch stands are all located on the south side of the "lead" track in order that they may be seen by the engineer, for the purpose of receiving signals.

There is also a "derail" switch, about half-way between the turn-table and switch No. 4. This "derail" switch is used to operate both the "derail" and the connection between the "lead" track and the turn-table.

After the train had backed from the East Market station to the depot, it moved backward on the "lead" track and on to switch track No. 1, for the purpose of letting the fast train pass; to get another coach that was on that track; and also to clear the "lead" track so as to enable the dining car to be taken off the fast train and placed on track No. 2, as was customary.

Shaw was standing on the rear of the train, controlling its backward movement by a bell-cord connected with the engine. However, after the train had started in on switch track No. 1, Shaw ascertained there would not be sufficient room for his train upon that track, because of the presence of other cars there. Accordingly, he stopped the train, jumped off the car, and gave Jones, the engineer, a signal to pull east out of switch No. 1, which was done. About the same time the conductor jumped off the train. Shaw then threw the switch connecting the "lead" track with switch track No. 1 so the train could pass on down the "lead" track, it being his evident purpose to run the train back on the "lead" track until the fast train had passed.

After throwing switch No. 1 Shaw signalled the engineer to back the train down the "lead" track, Shaw walking or running ahead, evidently for the purpose of throwing switches Nos. 2, 3, and 4, and the "derail" switch, so as to keep the train on the "lead" track until it had cleared track No. 2. In obedience to the signal given by Shaw, the train began backing slowly, at the rate of about three miles an hour, Shaw running ahead of it throwing switches 2. 3, and 4, as he passed them.

Up to this point there is no material conflict in the testimony of the several witnesses; but, as to what happened after switch No. 4 was thrown, the testimony is conflicting.

According to Shaw's version, after throwing switch No. 4, and when he started to go directly across to the south side of the "lead" track for the purpose of reaching the "derail" switch, his feet were caught in a hole or opening between one of the ties and the rod which runs across the track and below the rails, connecting switch No. 4 with the switch stand; and while held in that position he was struck and knocked down by the train, which cut off his right leg and the larger part of his left foot.

Shaw testified that the conductor told him to "hurry up" and throw the switches on the "lead" track without waiting for the signals to continue backing, which, usually, were given after each switch had been thrown; and, that the engineer continued to back the train without waiting for the usual signals.

The conductor contradicts Shaw in this respect; but the engineer testified that he continued to back the train until he lost sight of Shaw's lantern, and that he then stopped the train and told the conductor something must be wrong at Shaw's end of the train.

According to the company's version of the accident, Shaw was struck and run over at a point about 37 feet west of switch No. 4, while either walking or running beside the track, and trying to cross over the track; that he was not struck at switch No. 4, and that his injury was not and could not have been the result of his foot catching between the switch rod and the tie, as he claimed.

The action was brought under the federal employers' liability act. The petition as amended alleged, in substance, that appellant was negligent: (1) in operating its train that ran over Shaw; (2) in failing to have lights in the yard; and (3) that switch No. 4 and the tracks in that immediate vicinity, were in such a defective and dangerous condition, that Shaw was not furnished a reasonably safe place to work.

The answer contained a traverse of the allegations of the petition, and affirmatively relied upon the defenses of contributory negligence and assumed risk, upon the part of Shaw.

Upon the trial the circuit court held that there was no negligence shown in the operation of the train, the proof being that the brakeman and conductor were elsewhere at the time of the accident, in the performance of the duties required of them; that the train was being operated under signals given by Shaw; and, that the engineer stopped the train the moment he lost sight of Shaw's signal lantern.

The circuit court also refused to submit to the jury the question as to whether the appellant was negligent in failing to have lights in its yards, presumably upon the theory that this condition had existed for several months, and was fully known to appellee, who assumed that risk.

We are led to assume that the reasons above given influenced the court, as therein indicated, since the only issue of negligence upon the part of the company which was submitted to the jury was, whether Shaw was injured at switch No. 4, and if so, whether the company negligently failed to keep the switch rod connecting the switch stand of switch No. 4 with the "lead" track, and the ties and ground between said switch stand and the south rail of the "lead" track, in a reasonably safe condition.

1. The action was brought under the federal employers' liability act, the petition charging that both the appellant and the appellee were engaged in interstate commerce. Appellant filed its petition for a removal of the case from the state court into the United States district court, charging, after setting out the requisite diversity of citizenship, that the allegations as to the interstate nature of appellee's employment were untrue; that they were known by Shaw to be untrue; and that they were made for the sole purpose of fraudulently preventing the appellant from removing the case to the federal court.

A demurrer to the petition for a removal was sustained; and appellant contends that the record shows a fraudulent attempt by Shaw to oust the federal court of its jurisdiction, and that its petition for a removal should have prevailed, notwithstanding the amendment of 1910 to the federal employers' liability act provides that the jurisdiction of the federal courts shall be concurrent with that of the state courts in such cases, and that no case arising under the federal employers' liability act, which is brought in a state court of competent

jurisdiction, shall be removed to any court of the United States. 36 Stat. at L. 291; Chap. 143, U. S. Comp. Stat; Supp. 1911, pp. 1324, 1325.

As a question of practice, appellant insists that under the record thus made, the case stood removed into the federal court, and that it remained for that court to try the question of fraudulent allegation of jurisdictional facts, and remand the case to the state court in case appellant failed to sustain the charge; and, that the state court was without authority or jurisdiction to try that question, or to further proceed with the trial of the case.

We do not so understand the practice.

Section 6 of the amendment of 1910 to the federal employers' liability act, now known as section 28 of the Judicial Code of March 3rd, 1911, provides, in part, as follows:

"Jurisdiction of the courts of the United States under this act shall be concurrent with that of the courts of the several states, and no cause arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States."

In order to bring an action under the federal employers' liability act, the petition must allege, among other things, that the plaintiff was engaged in interstate commerce at the time he was injured; and, according to appellant's·contention, if the plaintiff fraudulently makes that essential allegation in his petition, the defendant has the right to remove the case to the federal court upon the ground of diverse citizenship, and the state court cannot pass upon the question raised by the petition for a removal.

If this be the correct practice, every case may be removed to the federal court, notwithstanding the provision of section 28, *supra*, and the federal court alone would have the right to determine that question.

The effect of such a rule would be to give the federal courts exclusive jurisdiction of the merits in every case of this character, although such jurisdiction is expressly made concurrent with that of the state courts, and the defendant, by the express terms of the statute, is prohibited from removing the case into the federal court.

Under a petition properly drawn under the federal employers' liability act, the state court has jurisdiction to try the merits of the case, including the question as to whether the plaintiff was injured while engaged in

interstate commerce; and, under our practice as announced in the late cases of I. C. Ry. Co. v. Kelly, 167 Ky., 745, and C., N. O. & T.. P. Ry. Co. v. Tucker, 168 Ky., 149, if the plaintiff fails to show that he was injured while engaged in interstate commerce, his case fails for proof, and a peremptory instruction to find for the defendant is proper.

In I. C. Ry. Co. v. Coley, 121 Ky., 385, 1 L. R. A. (N. S.), 374, in speaking of an alleged fraudulent misjoinder of parties, this court said:

"When the petition discloses a cause of action which is not within the jurisdiction of the federal court, the case may not be removed to the federal court for that court to try a case over which it has no jurisdiction, or to pass on the jurisdiction of the state court over the case. It cannot be maintained that the circuit court of the United States is only to determine in cases of this sort whether the joinder is fraudulent, and made without reasonable expectation on the part of the plaintiff to prove the facts alleged, and that it is the exclusive forum to determine this question; for in not a few cases the state court would hold upon the evidence that the plaintiff had made out his case against both the defendants, while in the federal court, upon the same evidence, it would be held that the plaintiff had failed to make out his case, and that therefore the joinder was fraudulent. The result would be that the state court would be prevented from proceeding in a case admittedly within its jurisdiction, by reason of the fact that the federal court was of opinion that there was no merit in the case. It was not contemplated by the act of Congress that the circuit court of the United States should be given supervisory power over the state courts on the merits of joint controversies of this character."

Again, in I. C. Ry. Co. v. Houchins, 121 Ky., 525, 1 L. R. A. (N. S.), 377, in speaking on the same subject, this court said:

"Such a rule would deprive the litigant of his right to try his case under the laws of the State, and would compel him to get into the merits of his case before a tribunal without jurisdiction to sit in it. If the state court makes a mistake, an appeal may be taken to this court; and if the railroad company feels aggrieved by the decision of this court, it may in every case prosecute an appeal to the Supreme Court of the United States on

the question. So, it is not without remedy, and there is no possibility of its rights not being properly protected."

See also, Clinger v. C. & O. Ry. Co., 128 Ky., 736, 15 L. R. A. (N. S.), 998; Ward v. Pullman Co., 131 Ky., 142, 25 L. R. A. (N. S.), 343; Golden v. N. P. R. R. Co., 39 Mont., 435, 34 L. R. A. (N. S.), 1159.

The averments of the petition conclusively show the case is brought under the federal act; that plaintiff is seeking to recover on a case arising under that act.

In Stafford v. Norfolk & Western R. Co., 202 Fed., 605, it was held that where the plaintiff claimed that his action was within the federal employers' liability act, and based his right to recover solely upon it, the case was one arising under that act, even though it was conceded that plaintiff's intestate was not employed in interstate commerce, and that plaintiff ultimately would not be able to recover under the act.

And, in Strauser v. Chicago B. & Q. R. Co., 193 Fed., 298, it was held that by the amendment of 1910, Congress plainly showed its intention that no case should be removed from the state court upon any ground, provided it arose under the federal employers' liability act. See also Lee v. Toledo, St. L. & W. R. Co., 193 Fed., 685; Kelly v. C. & O. R. Co., 201 Fed., 602; Rice v. Boston & M. R. Co., 203 Fed., 580.

In Hulac v. Chicago & N. W. R. Co., 194 Fed., 747, the court said:

"It is a well-recognized fact in judicial history that plaintiffs in actions brought by employes against railway companies for damages resulting from personal injuries have quite generally, and for many years, sought to bring and retain their actions in the state courts, and the fact is well attested by the multitude of applications to remand such cases which have been constantly presented to the federal courts. The expense of trials and of appeals in the federal courts have been deterrents, and the variance in the rules of law in such cases as applied in the state and federal courts has also been well understood. Congress has recognized by the employers' liability act, as well as by the safety appliance acts, that these rules of law should be made more favorable to the injured servant. The purpose of Congress in the enactment of the employers' liability act was the granting of additional rights to the servant, and the re-

moval of existing defenses by the master, in actions by injured employes against railway companies. One of the rights which Congress had in mind was the right of the servant to choose the forum in which his action should be litigated. The amendatory act of Congress gives concurrent jurisdiction to the courts of the United States with the courts of the states, and increases the number of districts in which the plaintiff may sue in the United States courts, and, while thus enlarging the rights of the plaintiff, and in harmony with the general scope of the act, cuts down the rights of the railway company by forbidding a removal of the case upon any ground.''

To the same effect see Stone v. South Carolina, 117 U. S., 430; Alabama G. S. R. Co. v. Thompson, 200 U. S., 206; C., N. O. & T. P. Ry. Co. v. Bohon, 200 U. S., 221; Crehore v. O. & M. R. Co., 131 U. S., 240.

So, the rule of procedure must be treated as settled that the state court, having jurisdiction of the case as stated, is not bound to surrender its jurisdiction on a petition for removal, until a case has been made which, on its face, shows that the petitioner has a right to the transfer of the case to the federal court, and that the state court is at liberty to determine for itself whether, on the face of the record, a removal has been effected. If the state court should decide erroneously against the removal, and proceed with the cause, its ruling on that question can be reviewed, after final judgment, by the United States Supreme Court.

There was no error, therefore, in the state court proceeding with the trial; and, under the state practice as above pointed out, if Shaw had failed to show he was engaged in interstate commerce at the time of his injury, appellant's motion for a directed verdict would have prevailed.

2. But, as we read the evidence, Shaw was clearly engaged in interstate commerce at the time of his injury. We think that is apparent from a mere statement of the facts.

The ''Maysville Accommodation'' train which Shaw was assisting in operating at the time of his injury, had run from Cincinnati, Ohio, to Maysville, Kentucky, and, under special orders, after it had completed its usual trip from Cincinnati to Maysville, it was, according to appellant's contention, to make a special trip from Maysville, Kentucky, to Russell, Kentucky, and not merely

extend its usual trip from Cincinnati, Ohio, to Russell, Kentucky, and return.

Clearly, if Shaw was injured on the journey from Cincinnati to Maysville, he was engaged in interstate commerce; and, if the trip from Cincinnati, Ohio, to Russell, Ky., be treated as a continuous trip, he was likewise engaged in interstate commerce. But, it is contended by appellant, if the trip from Maysville to Russell and return is to be treated as a special movement, and not a mere continuation of the usual trip from Cincinnati to Maysville, appellant was not engaged in interstate commerce, at the time he was injured.

Under our view of the proof, however, we do not think it necessary to take into consideration the nature of the proposed trip from Maysville to Russell and return, since we think it clear from the evidence that appellant's initial trip from Cincinnati, Ohio, to Maysville, Kentucky, had not been completed at the time Shaw was injured, since it was a part of that trip to place the train upon the "lead" track. The fact that the accommodation train was placed upon the "lead" track for the purpose of permitting the fast train to pass, and not for the purpose of remaining there until the next morning, as it usually did, can not change the controlling fact that it was a part of Shaw's duty to assist in placing his train upon the "lead" track, out of the way of trains passing upon the main track.

Furthermore, the proof shows that the special order to go to Russell also directed the conductor of the accommodation train to take an extra coach out of the Maysville yard for his excursion train, and that it was necessary for the accommodation train to back into the yard for the purpose of getting that coach. The initial trip from Cincinnati, Ohio, to Maysville, Kentucky, was not completed, under the usual method of handling the train, until the train had been put on the "lead" track, and out of the way of the fast train. They had not begun to make up the train for the Russell excursion at the time appellee was injured.

In St. Louis, S. F. & T. R. Co. v. Seale, 229 U. S., 161, the court said:

"In our opinion the evidence does not admit of any other view than that the case made by it was within the federal statute. The train from Oklahoma was not only an interstate train, but was engaged in the movement of

interstate freight; and the duty which the decedent was performing was connected with that movement, not indirectly or remotely, but directly and immediately. The interstate transportation was not ended merely because that yard was the terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or to stop at that station, it still was necessary that the train be broken up, and the cars taken to the appropriate tracks for making up out-going trains, or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the state line. McNeill v. Southern R. Co., 202 U. S., 543; Johnson v. Southern Pac. Co., 196 U. S., 1, 21.''

See also L. & N. R. R. Co. v. Walker's Admx., 162 Ky., 213; and C. & O. Ry. Co. v. Kornhoff, 167 Ky., 353.

We conclude, therefore, that at the time Shaw was hurt, he was engaged in operating the interstate train from Cincinnati, Ohio, to Maysville, Kentucky, and was not engaged in operating "Extra 73," which was to be thereafter made up and run from Maysville to Russell and return, even if that train should be treated as distinct and separate from the interstate accommodation train.

3. But it is contended that no negligence was shown upon the part of appellant, and that its motion for a directed verdict should have prevailed.

As the court, by its instruction, limited the scope of appellant's negligence to the single question of the condition of switch No. 4, appellant's complaint here must be confined to that question.

Briefly stated, the situation was this: The ties were 8 or 10 inches thick, and were ballasted with cinders; but between the two ties where the iron switch-rod ran from the switch-stand across the "lead" track to the switch track, it was necessary that there should be left unballasted a space of about five inches extending down from the top of the ties, in order that the switch-rod could work easily, and be free from interference by the cinders and dirt below. According to Shaw's version, there was no ballast at all between the two ties which carried the switch-rod, thus leaving an unballasted space of a depth equal to the thickness of the ties—8 or 10 inches—or about five inches deeper than was necessary for the proper management of the switch-rod. Shaw

says when he started to cross the track, his foot was caught in between the tie and the switch-rod—his foot going down about eight inches and in such a way as to prevent him from extricating it before the train was upon him; and it is contended that if the track had been ballasted to a depth of only five inches between the ties which carried the switch-rod, it would have been reasonably safe and there would also have remained abundant space for the working of the switch-rod. One can readily understand that a hole between the rod and the tie ten inches deep might be much more dangerous than a hole only five inches deep. In case the hole was ten inches deep, it is evident that one's foot could easily get caught under the switch-rod; while in case the ballast was brought up to the switch-rod, thus leaving a hole only five inches deep, it would be more difficult to get the foot entangled under the rod. The fact that the switch was of standard make and pattern did not relieve the company from the duty of making the hole no deeper than was necessary.

We conclude, therefore, that there was sufficient evidence of the unsafe condition of the roadbed at switch No. 4 to authorize the submission of the question of the company's negligence to the jury.

4. Appellant further insists that the verdict is flagrantly against the evidence, in that it shows that the accident did not occur at switch No. 4, as claimed by Shaw, but that it occurred about thirty-five feet south of switch No. 4, thereby indicating that Shaw was not injured by reason of his foot getting caught in the switch, as he claims, but from his own negligence in crossing the track in front of the train.

Brashears, the section foreman, testified that he visited the scene of the accident the next morning, and found evidence of blood and small pieces of flesh and clothing upon the rail about thirty feet south of switch No. 4; and King, the conductor, who was the first person to get to Shaw after the accident, says he found Shaw near the track, about forty feet south of switch No. 4.

Rockwell, the trainmaster, corroborates King, the conductor.

Dr. Taylor, who attended Shaw, testified that either on the night of the accident, or the next day, Shaw said they were switching the train out of the way of another train; that they were in a hurry; that he was running

along in front of the train parallel with the track to get to the switch and throw it, when he stumbled and fell on his hands and knees, and the steps of the coach hit him and switched his feet around under the train.

On the other hand, the appellee insists that he was hurt at the switch by getting his feet caught, as hereto-fore indicated, and in this he is corroborated by his son, James Shaw, who testified that he found his father, immediately after the accident, lying a few feet from the switch. It is true that the son, James Shaw, at first testified that his father was lying nearer to the place where King says he found him; but upon re-examination James Shaw corrected that statement, by saying that he found his father nearer to the switch.

Under this contradictory proof it was for the jury to pass upon the issue.

5. Appellant further insists that the trial court erred in declining to submit to the jury its defense of assumed risk upon the part of the plaintiff.

Upon that subject, appellant offered instruction "C," which reads as follows:

"The court instructs you that the plaintiff can not complain of or recover for any failure upon the part of the defendant to have lights in its switch yard. The plaintiff assumed the risk from such condition of the yard."

Under the rule in this jurisdiction, which does not permit a party to complain of a failure of the court to give instructions unless he offers an instruction upon the question, it might fairly be said that the appellant can not now complain that the court failed to give an instruction upon assumed risk with reference to the condition of switch No. 4, which was the only question of negligence submitted to the jury.

An instruction, however, upon assumed risk had no proper place in this case, because a servant does not assume the risk of accident and danger due to the failure of the master to exercise ordinary care in furnishing him with a reasonably safe place to do his work. A servant's assumption of the risks of his employment must be considered with reference to the employer's primary duty to furnish reasonably safe surroundings. Broadway Coal Mining Co. v. Southard, 144 Ky., 453. A servant does not assume risks that follow from the negligent acts of the master. Geary v. McCreary, 147 Ky.,

254; Kentucky Refining Co. v. Schutz, 148 Ky., 535; C., N. O. & T. P. Ry. Co. v. Callahan, 148 Ky., 682; East Tenn. Telephone Co. v. Jeffries, 153 Ky., 133.

The rule was stated in Fluehart Collieries Co. v. Elam, 151 Ky., 50, as follows:

"In accepting employment the appellee assumed the risk of such accidents and resulting injury as might happen to him in the ordinary and customary course of his employment, but he did not assume any risk from accident or injury caused by the failure of the coal company to exercise ordinary care to furnish him a reasonably safe place in which to work. The risk that the servant assumes does not embrace or include risks that are brought about by the failure of the master to perform his duty."

The negligent act of the company in failing to furnish the appellee a reasonably safe place to work, being the basis of its liability, the court properly declined to submit to the jury the question of appellee's assumption of the risk attending that negligence.

6. It is further objected that instruction No. 5, defining the measure of damages, erroneously permitted the assessment of double damages, because it not only authorized a finding of damages for time lost by Shaw, but also for the impairment of his power to earn money "since the accident," without qualifying this last element of recovery by directing that any allowance for the loss of power to earn money should begin when the time lost had ended.

The instruction, however, is not as broad as the criticism would indicate. After directing the jury in case it should find for the plaintiff, to find for his loss of time and for pain and suffering, if any, they were authorized to find "such further sum as you may believe from the evidence will reasonably compensate him for the impairment, if any, of his power to earn money."

It is true the instruction did not qualify this last element of recovery by expressly confining it to appellee's power to earn money in the future; yet we believe that is the meaning of the instruction when read as a whole, and that it could not have prejudiced appellant's rights. Furthermore, if the appellant had desired to have a more specific instruction, it should have asked the court to make it so; and, having failed to call the court's attention to the immaterial error, it will not now be permitted

to complain. Blue Grass Traction Co. v. Ingles, 140 Ky., 488; McClintic Marshall Con. Co. v. Eckman, 153 Ky., 708; I. C. R. R. Co. v. Williams, 163 Ky., 835; N. C. & St. L. Ry. Co. v. Henry, 168 Ky., 453.

7. Finally, we are asked to reconsider the former rulings of this court in which it was held not to be error for the trial court to instruct the jury, under the state practice, that nine or more of the jury could return a verdict. It is argued that in trials in the state court of cases brought under the federal employers' liability act, there must be a unanimous verdict, as required by the federal constitution, and that Congress was without power to confer jurisdiction upon the state court to thus try a cause of action created by a federal statute, it not being a "court of competent jurisdiction," as defined by the federal act, because it permits the finding of a verdict by nine jurors.

This question was considered and decided adversely to the contention of appellant in C. & O. Ry. Co. v. Kelly's Admx., 161 Ky. 655; L. & N. R. R. Co. v. Johnson's Admr., 161 Ky., 824; and in L. & N. R. R. Co. v. Stewart's Admx., 163 Ky., 827. Upon a reconsideration of the question we see no reason for departing from these decisions.

8. Rule 5 of this court reads, in part, as follows:

"(4) A full index of the entire record, whether it contains one volume or more, must be put at the beginning of the record —— ——.

"(8) Records not conforming to this rule will be condemned and the clerk making out such record will be prohibited from collecting his full fees therefor; and the clerk of this court will, in taxing costs, tax only so much thereof as the court allows."

As this record of 206 pages is wholly without an index, it is condemned, and the clerk who made the record will be prohibited from collecting any fee therefor.

Judgment affirmed.